## THE COBALT.
### C. W. CRANE & CO. v. CHARLES DREIFUS & CO.

#### No. 15205.

District Court, E. D. New York.
Jan. 23, 1939.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for libellant.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for respondent.

GALSTON, District Judge.

At about 9:45 A. M. on January 29, 1937, the scow Cobalt, chartered by the respondent and to be delivered to the respondent and loaded with scrap iron at its yard at the foot of Calyer Street, Brooklyn, was brought up to the dock of the respondent's plant. Along the bulkhead of the dock, when the Cobalt arrived, was the derrick, J. H. Manning, engaged in loading a barge, Rockhaven, alongside the Manning. To the north of the bulkhead and adjoining the yard there was what was called a cut or recess of irregular dimensions, about 115 feet long in-shore, 103½ feet out-shore, 33 feet in width on the southerly side and 27 feet on the northerly side thereof. Brown, the superintendent of the respondent, ordered the barge placed in this cut. At that time there was some talk between the scow captain and Brown. The scow captain said: "I reminded him about it—the scow could not be loaded in there at low tide." After the scow was tied up, Nare, the scow captain, left the barge to telephone his office. On his return he had another talk with Brown in which he asked Brown to check on the stern and see what clearance the scow had. Brown replied that he had already looked. Shortly after that a load of scrap iron was put on the scow. Later, between twelve and one, Kenny, from the libellant's office, arrived at the dock. Together the bargeman and Kenny loosened the lines and pushed the scow out as far as they could get her, but found that the derrick had to be moved before they could do more. Later the derrick was moved. On further efforts to move the scow she was found caught at both ends in an ebbing tide.

Time becomes significant in determining whether the bargeman acted with such dispatch as the situation called for. The scow was berthed at 9:45. Nare didn't get back from his telephone call until about 10:30. At 9:45 there were 4½ feet of water in the recess. The tide was high at 11:06 A. M., the depth being about 4 feet 9 inches. At 12:45 P. M., at about which time Kenny arrived at Calyer Street, with an ebb tide the depth was 4 feet and at 2 P. M., when the scow was hung up, the depth was 2.8 feet.

Brown testified that the clearance when the scow was put in the cut between the scow racks and the ends of the cut was about two feet. He said that two loads, weighing about ten tons, were put on board the Cobalt between 10:45 and 11:15 A. M., but that those loads practically had no effect on her draft. The clearance be-

tween the racks and the ends at that time was about a foot or à foot and a half.

There is not much contradiction in essential facts between the stories told by the scow master and respondent's superintendent. Brown testified that when the scow was delivered the derrick lighter Manning was occupying the bulkhead to the south of the cut and that this lighter was loading the Rockhaven barge. Brown had two talks with the captain of the Cobalt, first on arrival and secondly at the time the two loads referred to were put on the scow. In each of these talks he told the captain that whenever the scow was in danger of getting caught "he should let us know and we would push him out." The barge captain made no reply to that request or order. Brown said: "I had various duties to perform up there, and I left it up to him to let me know when he was in danger so that we could get him out of there. That was our intention when we put him in there, to load a couple of truck loads that came down, and we knew that around noon time, or some time a little after that, the barge would be in danger of getting caught on account of the tide receding, and our intention was to push him out of the cut in the afternoon, and the next morning we would finish loading him with the derrick lighter Manning."

The captain of the Cobalt failed to notify Brown of approaching danger and it was not until the early afternoon around two o'clock that Brown found the Cobalt was caught in the cut. It is clear that if the captain of the Cobalt had requested assistance before she became hung up, the Cobalt could have been moved in ten or fifteen minutes.

It is significant that Kenny did not arrive on the scene until almost one o'clock, though the scow captain's telephone call to the libellant's office was made between 9:45 and 10:30 A. M. One must conclude from the facts that the scow captain on arrival was cognizant of the danger. Indeed he admits it and the telephone call to his office was because of such realization. The case narrows then to the question of whether the scow master did everything that should have been done in the premises. He was still concerned apparently at 10:30, but neither notified Brown of approaching danger nor did anything effective to meet the impending difficulty occasioned by the ebb tide. It is not unreasonable to infer that he felt his duty to his employer—the libellant—was fulfilled when he put in the telephone call, and thereafter waited confidently for the arrival of Kenny, the libellant's marine superintendent.

The facts are not unlike those in Dailey et al. v. Carroll et al., 2 Cir., 248 F. 466. There too there was a charter of a scow having no motive power; and the owner sent with it a master in his own pay, just as appears in the present libel, where the respondent herein chartered the scow Cobalt in charge of a captain in the employ of her owner at an agreed pay per day. Judge Hough significantly inquired [page 468]: "as between the parties to the contract of charter, the question may always be asked: For whom was a given employé acting when the act complained of occurred?" Though the evidence might disclose that the charterer is in absolute control and entitled to direct the navigation and employment of the vessel, that point is not conclusive. The ultimate question is: what was the subject of the bailment? Judge Hough answers:

"Not the bare boat, but the boat and man; and just as the boat was impliedly warranted seaworthy, so the man was impliedly represented competent and careful to take care of the boat; he existed and was supplied for that purpose. * * *

"If the man whom the owner pays and furnishes for this purpose fails (for example) to watch and arrange his lines according to the exigencies of the tide, he fails to serve the charterer just as much as the boat would fail to serve, should she be unseaworthy through no fault of the charterer."

The remaining reflection is whether the respondent was negligent because Brown failed to inspect the Cobalt after the two loads had been put on and before she was caught in the cut at about 2 o'clock. Doubtless had he been around the damage would not have occurred but he was busy with other work and relied on the scow captain to notify him of the danger of approaching contact. In the circumstances Nare's failure to do so was the sole and proximate cause of the damage. See, also, U. S. Trucking Corporation v. City of New York, 2 Cir., 18 F.2d 775; and Hastorf v. Hudson River Stone Sup-

ply Co. et al., D.C., 110 F. 669; Schoonmaker v. City of New York, 2 Cir., 167 F. 975.

The libel will be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.